* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Holmes, and the briefs and oral argument before the Full Commission. The appealing parties have shown good ground to reconsider the evidence. However, upon reconsideration, the Full Commission affirms with some modifications the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. The parties are properly before the Industrial Commission and are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed at all times relevant herein.
3. Defendant was self-insured at all times relevant herein.
4. Plaintiff's average weekly wage was $290.55, yielding a compensation rate of $193.70 per week.
5. Various medical records and Industrial Commission filings were stipulated into evidence at the Deputy Commissioner's hearing.
6. The issues before the Full Commission are whether plaintiff is disabled as a result of the compensable injury by accident on April 27, 1992; whether plaintiff complied with the Commission's Orders to cooperate with vocational rehabilitation; whether plaintiff timely asserted a change of condition; and whether plaintiff's high blood pressure, depression, diabetes, and failed back syndrome are causally related to his injury by accident.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing plaintiff was 36 years old. He has a ninth grade education and does not have a GED. Plaintiff has worked since he was 16 years of age in the livestock and construction industries. Plaintiff is a farmer and resides on his farm in Gibsonville, North Carolina. In 1990, defendant hired plaintiff to be a machine operator *Page 3 
to maintain the lawns and plant beds along North Carolina highways. This work involved the use of tractors, plows, and other equipment.
2. Plaintiff first injured his back on the job on October 27, 1991, for which he missed no time from work. On April 27, 1992, plaintiff again injured his back in the course of his employment with defendant. Plaintiff was diagnosed with an L3-4 herniated disc based on MRI, CT and myelographic studies. On June 23, 1992, the parties entered into a Form 21 agreement, which was subsequently approved by the Industrial Commission on June 29, 1992.
3. On September 25, 1992, Dr. James C. Califf, orthopedic surgeon, performed surgery on plaintiff for a herniated disc at L3-4. Dr. Califf found plaintiff to be at maximum medical improvement from his back injury on April 7, 1993 and assigned a 15% permanent functional impairment rating to plaintiff's back.
4. On July 28, 1993, plaintiff began treating with Dr. Craig Derian, an orthopedic surgeon, and continued to treat with him until November 1999. At an appointment on March 17, 1994, plaintiff cried frequently during the evaluation. In addition to his degenerative disc disease at L3-4, L4-5 and L5-S1, Dr. Derian felt plaintiff had worsening of an underlying depression. Dr. Derian did not feel that plaintiff was able to work and would not have recommended that plaintiff do any heavy activities, particularly when he was undergoing a severe exacerbation of his depression.
5. On May 23, 1994, plaintiff informed Dr. Derian that he did not want to undergo further surgery. Dr. Derian returned plaintiff to work with restrictions of no lifting more than ten pounds, no prolonged bending, lifting or stooping, and instructed that plaintiff be allowed frequent position changes from sitting, standing, to walking. Dr. Derian also noted that if plaintiff were to consider surgery, he would recommend at least six to eight months of *Page 4 
psychiatric intervention to control plaintiff's depressive symptoms. At that time, Dr. Derian gave plaintiff a 30% impairment rating to his back.
6. After the visit on February 14, 1995, plaintiff did not return to Dr. Derian until April 2, 1998. Dr. Derian felt that plaintiff continued to have disc degeneration at L3-4, L4-5, and L5-S1, status post decompression, and that he had ongoing depression. Plaintiff complained of low back pain and right extremity problems including give-way symptoms. Dr. Derian felt plaintiff could perform a sedentary light-duty job, approximately four to six hours per day, with restrictions. At that time, Dr. Derian did not feel plaintiff was a candidate for a work hardening or a conditioning program, since it could cause increased flare-ups of his disc degeneration. However, he did feel that plaintiff could participate in the passive or sedentary aspects of a job club, such as creating a resume and online learning. Dr. Derian noted that plaintiff was not malingering.
7. On March 11, 1998, the Commission's Executive Secretary ordered plaintiff to cooperate with vocational rehabilitation efforts. In August 1998, plaintiff was scheduled to participate in a job club program as part of a vocational program to assist him in locating employment. Plaintiff failed to comply with this program. Defendant filed a Form 24 seeking to suspend indemnity benefits for plaintiff's failure to participate in the job club program.
8. In May and June 1998, plaintiff returned to Dr. Califf who stated in a letter dated May 25, 1998 to the case manager that plaintiff was released to sedentary work up to eight hours a day, with restrictions of no lifting over 10 pounds, no repetitive squatting, stooping, bending or twisting, and with frequent position changes.
9. On September 10, 1998, a Form 24 hearing was held before Special Deputy Commissioner Ronnie E. Rowell. On September 18, 1998, the Special Deputy Commissioner *Page 5 
entered an Administrative Decision and Order allowing defendant to suspend payment of compensation from August 3, 1998, when plaintiff failed to attend the job club program, until plaintiff participated to the best of his ability in a satisfactory completion of the job club program, unless properly excused from such participation and completion by his physician or by defendant. The September 18, 1998 Administrative Decision and Order was not appealed and has become final.
10. On October 2, 1998, Dr. Califf approved plaintiff's participation in a three-week job club program for six hours per day, five days per week. The program was described to Dr. Califf in a September 30, 1998 letter from rehabilitation consultant John E. Adams as sedentary, requiring no lifting or carrying over five pounds, and with no pushing, pulling, climbing, balancing, stooping, kneeling, crouching, crawling, or reaching. The function of the job club program was to hold group discussions regarding job-seeking variables, completion of vocational tests, vocational exploration and job lead assignments, and role-play of job search activities.
11. In October 1998 and with the assistance of Mr. Adams, plaintiff was again placed in the job club program for a three-week period, Monday through Friday, from 9:00 A.M. to 3:00 P.M. Mr. Adams reported that on October 8, 1998, plaintiff was not compliant with the job club program. Plaintiff left the job club program early on the second day to confer with his attorney, and did not return on the third day. Mr. Adams immediately sent letters to plaintiff and his attorney requesting that he promptly return to the program. On October 8, 1998, plaintiff told Mr. Adams that he intended to go to the beach the next day with his family and therefore would not be in attendance at the job club. Plaintiff did not return to the job club program. The Full Commission finds that plaintiff failed to comply with reasonable vocational rehabilitation efforts and that the suspension of plaintiff's compensation was proper. *Page 6 
12. On November 18, 1999, Dr. Derian saw plaintiff, who had recently undergone a lumbar MRI. At this time, Dr. Derian felt plaintiff was permanently and totally disabled from work based primarily on his low back pain. Dr. Derian also stated that plaintiff's depression was caused by his chronic back pain.
13. Dr. Derian testified at his deposition on November 28, 2005, that plaintiff continued to be totally disabled from work and that he recommended a back fusion surgery at L3 to the sacrum. Dr. Derian explained, however, that before any surgery can be performed, plaintiff requires treatment for his depression. Dr. Derian testified that plaintiff's depression was in a large part related to his chronic pain following his original injuries, although there may be other factors that predispose plaintiff to depression. Dr. Derian explained that plaintiff's injury by accident and subsequent chronic pain were significant contributing factors in the development of his depression.
14. Dr. Derian testified that plaintiff's disc rupture and symptomatic disc degeneration directly relate to the injuries in 1991 and 1992, and that the April 27, 1992 injury appears to have been the major precipitating injury that caused the exacerbation of his underlying disc degeneration, which resulted in disc herniation requiring surgery and persistent back and leg pain. Dr. Derian stated that as of 1999, plaintiff was disabled from competitive employment, although plaintiff could do sedentary, intermittent part-time work, such as attend a program to learn how to write a resume, search for on-line jobs, and learn how to attend a job interview. However, Dr. Derian stated that it was his opinion that plaintiff would not be able to complete a job club program that required attendance for three weeks, six hours per day, five days per week. Since 1999 plaintiff has not returned to Dr. Derian, who has not released plaintiff to return to work. Dr. Derian reviewed plaintiff's more recent medical records and did not change his *Page 7 
assessment. Dr. Derian opined that plaintiff's condition will get progressively worse with time, although he may benefit from active/passive therapy or modalities, including psychological counseling and medication management, and possibly from surgery.
15. Plaintiff continued treatment over the years with Dr. Califf and, upon Dr. Califf's recommendation, a quantitative interdisciplinary evaluation of plaintiff was done at Wake Forest University Baptist Medical Center on January 23, 2002. The results of the evaluation showed that plaintiff was capable of performing work within the light-medium physical demand classification.
16. On December 12, 2002, plaintiff first saw anesthesiologist and pain specialist Dr. Pamela Vick for help with pain management and to determine if he was a candidate for a spinal cord stimulator. While examining plaintiff on that day, she did note that he appeared anxious and depressed, which she felt may have been related to plaintiff's chronic pain syndrome. Dr. Vick found that plaintiff had failed back syndrome and referred plaintiff to Dr. Jeanne Hernandez, a pain psychologist, to assist plaintiff with his depression. Dr. Vick did not feel plaintiff was a candidate for a spinal cord stimulator. Dr. Vick continued to treat plaintiff until June 30, 2003, at which time she had no further treatment to offer plaintiff. She stated at her deposition that although she hoped plaintiff's functioning would improve, plaintiff will continue to have ongoing pain and needs long-term medical care and counseling to assist with depression.
17. Dr. Vick testified that she does not perform disability evaluations, give ratings or restrictions, and that she did not make any assessment about plaintiff's ability to work. Dr. Vick stated that plaintiff's diabetes was not related to his pain, although it was possible his blood pressure could have been elevated from the pain. Dr. Vick explained that more than any other factor, plaintiff's *Page 8 
depression was making his pain worse. Dr. Vick testified that plaintiff's depression was related to his original injury, subsequent surgery, and problems with ongoing pain. While Dr. Vick testified that plaintiff's weight gain was most likely due to his inactivity from his ongoing chronic pain, she had no opinion about whether his weight gain significantly contributed to his development of diabetes.
18. On June 4, 2004, plaintiff filed a motion with the Executive Secretary's office to reinstate compensation. Plaintiff's motion was denied in the administrative forum, and the parties were instructed to file a Form 33 Request for Hearing.
19. On June 15, 2004, plaintiff had an independent medical examination with Dr. Robert Elkins. After reviewing plaintiff's medical records and examining plaintiff, Dr. Elkins diagnosed plaintiff with chronic low back pain and chronic pain syndrome. He felt that plaintiff probably did have depression, but noted that his diabetes and high blood pressure did not begin until approximately nine years after plaintiff's initial injury. Dr. Elkins believed that within a reasonable medical probability there was no causal relationship between plaintiff's original injury and his hypertension, diabetes, and hypercholesterolemia. Additionally, Dr. Elkins stated in his report, "I certainly feel this gentleman could do light to moderate work with no repetitive bending, stooping, or squatting, but with occasional lift of 30 pounds and frequent lift of 20 pounds."
20. In a letter dated February 13, 2004, Dr. Hernandez, pain psychologist at UNC, noted that plaintiff's depression, high blood pressure and diabetes were a result of plaintiff's compensable back injury and subsequent physical disability and back pain. Dr. Hernandez also stated that plaintiff could not have worked at any job during the time that she treated him, primarily because of his pain and limited physical function due to the pain. *Page 9 
21. Dr. Derian, Dr. Vick and Dr. Elkins all disagreed with Dr. Hernandez's opinion as to the causal relationship of plaintiff's high blood pressure and diabetes. The Full Commission gives greater weight to the testimony of Dr. Derian, Dr. Vick, and Dr. Elkins than to that of Dr. Hernandez, who is not a medical doctor, on the causal relationship of plaintiff's high blood pressure, high cholesterol and diabetes to his compensable injury. The Commission finds based upon the greater weight of the medical evidence that plaintiff's high blood pressure, high cholesterol and diabetes are not causally related to the compensation injury by accident. The Full Commission further finds based on the greater weight of the medical evidence that plaintiff's depression is causally related to the compensable injury.
22. Plaintiff testified at the Deputy Commissioner's hearing that he has not looked for employment but that he believes that he could work in a seed and feed store based on his knowledge of farming. Plaintiff testified that in addition to his pain, his depression contributed to his inability to successfully complete the job club.
23. Following the suspension of plaintiff's compensation, in order to have benefits reinstated, plaintiff had the burden to come forward with evidence that he was willing to comply with the Commission's Order or with evidence from a treating physician that he was unable to participate in vocational rehabilitation. The Full Commission finds that plaintiff's more recent medical records show that he is capable of some work but that he has not demonstrated a willingness to comply with vocational rehabilitation as ordered by the Commission.
 * * * * * * * * * * * *Page 10 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On April 27, 1992 plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer which resulted in an injury to his back, chronic pain and depression. N.C. Gen. Stat. § 97-2(6).
2. The Form 21 filed in this case created a presumption of continuing disability until plaintiff returns to work at wages equal to or greater than those he received at the time of injury. Watkins v. MotorLines, 279 N.C. 132, 181 S.E.2d 588 (1971).
3. N.C. Gen. Stat. § 97-25 provides that the refusal of a claimant to comply with vocational rehabilitation procedures after being ordered to cooperate by the Industrial Commission bars the injured worker from further compensation until such refusal ceases. In the case at bar, the Industrial Commission ordered plaintiff to cooperate with vocational rehabilitation efforts through the job club and, in the opinion of the Full Commission, plaintiff's refusal to cooperate was not justified.Id. Therefore, the September 18, 1998 Administrative Decision and Order of the Commission allowing defendant to suspend payment of plaintiff's compensation was proper.
4. It is undisputed that plaintiff failed to file a claim for additional indemnity compensation for over two years from the last payment of indemnity compensation. However, plaintiff's claim was not time barred by N.C. Gen. Stat. § 97-47 in that there had been no final determination of the extent of plaintiff's permanent disability.Beard v. Blumenthal Jewish Home, 87 N.C. App. 58, 359 S.E.2d 261 (1987);Perez v. American Airlines, 174 N.C. App. 128, 620 S.E.2d 288 (2005). *Page 11 
5. Plaintiff is entitled to payment by defendant of the medical treatment for his back and his depression resulting from his compensable back injuries. N.C. Gen. Stat. § 97-25; Hyler v. GTE Products Co.,333 N.C. 258, 425 S.E.2d 698 (1993). Defendant is not responsible for any medical treatment plaintiff may require for his diabetes, high blood pressure or high cholesterol.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff is HEREBY ORDERED to request assistance from the State Division of Vocational Rehabilitation and to comply with State vocational rehabilitation efforts for a reasonable, sustained period of time before the reinstatement of any compensation by defendant. If plaintiff does show that he has reasonably complied with vocational rehabilitation, defendant shall reinstate temporary total disability benefits to plaintiff, retroactive to the date plaintiff began complying with vocational rehabilitation. If defendant fails to reinstate compensation after being advised of plaintiff's sustained cooperation, plaintiff should direct a motion for reinstatement to the attention of Commissioner Mavretic.
2. Defendant shall pay for all medical treatment for plaintiff's back as a result of his original compensable injuries. Defendant shall also pay for treatment for plaintiff's depression.
3. Defendant is not required to pay for any medical treatment relating to plaintiff's diabetes, high blood pressure or high cholesterol.
4. Defendant shall pay the costs, including an expert witness fee of $1,000.00 to Dr. Derian if not already paid by prior order. *Page 12 
This 21st day of February 2007.
S/____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________________ CHRISTOPHER SCOTT COMMISSIONER
 S/___________________________ DIANNE C. SELLERS COMMISSIONER